# Richmond.

## Virginia-Carolina Chemical Co. v. Carpenter & Co.

### March 14, 1901.

### Absent, Keith, P., and Whittle, J.*

1. FRAUD—*Proof Required—Case at Bar—Arbitrary Refusal to Accept Goods.*—The law does not presume fraud, but, when charged, it must be clearly and distinctly proved. In the case at bar, the defendant is charged with bad faith in refusing to accept certain rock which it had agreed to accept if, upon test, it proved satisfactory. Circumstances were relied upon to show that the rock was really satisfactory, and that the refusal to accept was purely arbitrary, but they fail to establish bad faith with the clearness and distinctness required by law.

Error to a judgment of the Court of Law and Chancery of the city of Norfolk, rendered June 30, 1900, in an action of *assumpsit*, wherein the defendants in error were the plaintiffs, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*Hughes & Little*, for the plaintiff in error.

*G. M. Dillard*, for the defendants in error.

HARRISON, J., delivered the opinion of the court.

This case was before us upon a writ of error awarded the plaintiff in the court below, and an opinion was handed down March

*Argued before Judge Whittle qualified.

15, 1900, 98 Va. 177. The action was to recover damages for the refusal of the Virginia-Carolina Chemical Company to take from Carpenter & Co. certain Tennessee phosphate rock alleged to have been sold the defendant, which it refused to accept. The defence was that the rock was offered to and accepted by the defendant on the express condition that 100 tons was to be shipped to experiment with, and that the defendant was to take the remainder, if the sample of 100 tons proved satisfactory in quality and condition. The defendant declined to accept the rock upon the ground that it was not satisfactory.

The gist of the former decision was that it was for the jury to say, upon proper instructions, whether or not the defendant acted in good or bad faith in declining to take the rock upon the ground that it was not satisfactory. It appears from the record, now before us, that the case has gone to the jury upon proper instructions, and the sole question to be determined is whether or not the evidence is sufficient to sustain the verdict in favor of the plaintiff, which is necessarily based upon the conclusion that the defendant was guilty of bad faith in declining to take the rock.

To act in bad faith is to act fraudulently, and, as every one has attached to his actions the presumption of innocence, it is an established principle that a charge of fraud or bad faith must be clearly and distinctly proven. *Hord* v. *Colbert*, 28 Gratt. 49; *Gregory* v. *Peoples*, 80 Va. 355.

The testimony for the defendant is full to the effect that it was to its interest to take the rock if the test was favorable, and that it was anxious that it should be; that the sample of 100 tons was subjected to an unusually careful and thorough test; and that the conclusion that it was not satisfactory was influenced by no other consideration than an honest desire to ascertain if the rock could be made to answer the purpose for which it was intended.

This direct and positive evidence is not contradicted except so

far as it may be by certain circumstances relied on by the plaintiff, which it is contended are sufficient to establish the bad faith of the defendant. It appears that the 100 tons of rock reached the defendant in February, and that the test was made early in April. This delay in making the test is regarded by the plaintiff as alone sufficient to justify the jury in finding that the rock was approved and accepted.

No time having been specified for testing the rock, the law would presume that a reasonable time was intended for that purpose. The cause of delay is fully explained to have been the result of the crowded condition of the defendant's factory with materials for the manufacture of guano which had to be removed before the test could be made. The plaintiff could hardly have presumed that the test had been made, and the rock approved, when it was repeatedly, during the interval, writing letters, urging that the test should be made, and the contract for 3,000 tons closed, and receiving in reply letters from the defendant saying that the test had not been made, giving the cause of the delay, and declining to conclude the purchase until the test was made.

It further appears that when the defendant notified the plaintiff that the test had been completed, and that the rock was not satisfactory, it at the same time ordered 200 additional tons at the same price. It is contended that this order shows that the defendant was not really dissatisfied with the rock, or else had not completed the test. The uncontradicted evidence is that this order was coupled with the statement that the defendant was anxious to use the rock, if possible, because it was a cheaper source of supply than the Charleston or Florida rock, and that if the 200 tons were shipped, it would, during the summer, do all that could be done to find a method of working it, but that it would not agree to take the 200 tons under the alleged contract for 3,000 tons.

Another circumstance relied on by the plaintiff as showing

bad faith on the part of the defendant in declining to take the 3,000 tons is the purchase by it, shortly afterwards, from another party of a large quantity of the same rock at a reduced price. If the 3,000 tons had been taken, the agreed price was $2.03 per ton. After the test had been made, and the 3,000 tons had been rejected, the defendant concluded a contract for the purchase of 12,000 tons of this Tennessee phosphate rock at $1.10 per ton. It appears that the defendant used 75,000 tons of phosphate rock *per annum.* The purchase, therefore, of the 12,000 tons was but a fraction of its actual needs, and could not have interfered with the purchase of the 3,000-ton lot if the latter had been satisfactory. It further appears that the offer of 12,000 tons was made to S. T. Morgan, president of the defendant company, by a broker in phosphate rock, who did not disclose to whom the rock belonged, and the defendant was ignorant of the fact that it belonged to the same parties as the 3,000-ton lot. It further appears that no contract for the purchase of the 12,000 tons was concluded until September, five months after the 3,000 tons was declined. It further appears that no test was provided for, but that the 12,000 tons was an absolute and unconditional purchase, and that it had to be used under a tedious and expensive process; that guano and various other substances, not usually employed, had to be added before it could be used at all; that the price paid justified this addditional outlay, which could not otherwise have been incurred without loss. Mr. Morgan, president of the defendant company, in answer to the question whether or not the purchase of the 12,000 tons had any effect upon his action in declining to conclude the contract for 3,000 tons, says: "Absolutely none," and further says that he was influenced solely by the result of the test, which showed the rock to be unsatisfactory; that his company needed the rock, were anxious to get it, and would, if it had been satisfactory, have saved 75 cents to $1.00

per ton by its purchase at $2.03 per ton, when compared with the market price of other sources of supply.

A further circumstance relied on, as imputing bad faith, is that the defendant paid for the 100 tons, sent as a test, at the full contract price, thus, it is contended, admitting that the goods fulfilled the conditions of the contract; otherwise, there was no obligation resting on the defendant to pay for the test shipment. The correspondence between the parties from which is to be gathered the alleged contract is silent as to whether the 100 tons was to be paid for in the event the test was not satisfactory. The agreement, however, shows that the 100 tons was to be consumed in making the test, and the evidence shows that a test could not be made with less. Whether or not an obligation rested on the defendant to pay for the test shipment of 100 tons need not be determined. Conceding that the payment was voluntary, it is difficult to understand how such liberality on the part of the defendant could be construed into meaning that the goods had fulfilled the conditions of the contract, when the defendant had theretofore pronounced the goods unsatisfactory, and declined to receive another pound under the alleged contract.

These are the chief circumstances relied on by the plaintiff to establish the charge of bad faith on the part of the defendant in declining to conclude the purchase of the rock in question. Giving the fullest weight to the plaintiff's evidence, and looking alone to that of the defendant not in conflict therewith, we are of opinion that the charge of bad faith is not made out with the clearness and distinctness required in such cases.

In the case of *Hord* v. *Colbert, supra,* Judge Staples says: " Here it must be borne in mind that the law does not presume fraud. It is not to be assumed on doubtful evidence, or circumstances of mere suspicion. The party alleging the fraud must clearly and distinctly prove it. The *onus probandi* is upon him to prove his case as charged in the bill. If the fraud is not

strictly and clearly proved as it is alleged, although the party against whom the relief is sought may not have been perfectly clear in his dealings, no relief can be had."

For these reasons the judgment must be reversed, the verdict set aside, and a new trial awarded.

*Reversed.*